**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALBERTO BETO BECERRA,

Defendant - Appellant.

No. 05-2331

(D. New Mexico)

(D.C. No. CR-04-1312-RCB)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument.

Following a jury trial, Alberto Beto Becerra was found guilty of possession with intent to distribute 500 grams or more of a substance containing

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 (eff. Dec. 1, 2006) and 10th Cir. R. 32.1 (eff. Jan. 1, 2007).

methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), conspiracy, in violation of 21 U.S.C. § 846, and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). He was sentenced to 235 months on the conspiracy and drug possession counts, and sixty months on the firearm count, to run consecutively to the 235-month sentence, for a total sentence of 295 months. Becerra appeals his conviction, which we affirm.

**BACKGROUND**

Becerra's arrest and conviction occurred as a result of a multi-year investigation into a methamphetamine trafficking conviction organization run by Guadalupe Lopez.[1] In December 2003, federal agents working with a confidential informant purchased four pounds of methamphetamine from Lopez. Based upon this seizure and other information gleaned from their investigation, the agents obtained a wiretap on a cellular phone used by Lopez. Federal authorities began intercepting calls in March 2003.

On April 5, 2004, federal agents learned from intercepted calls that Lopez was planning to deliver four pounds of methamphetamine to Becerra. The agents began conducting surveillance of Becerra. They believed that Lopez would

---

[1] We recently affirmed the conviction of one of Becerra's co-defendants, Abraham Amaya. United States v. Amaya, __ Fed. Appx. __ (10th Cir. 2006).

deliver the methamphetamine using the same black Dodge pickup with Texas license plates that he had used in the December 2003 sale. Through intercepted calls and surveillance, the agents found the truck at a Budget Inn in Roswell, New Mexico, on April 6, 2004. At approximately 11:45 a.m., Becerra arrived at the Budget Inn in a small gray car, which agents learned was registered to Becerra's wife, Elizabeth Tarrango.

Shortly thereafter, the black truck, driven by co-defendant Amaya, and the small gray car, driven by Becerra, left the Budget Inn and drove to 7018 LaVanne in Hagerman, New Mexico. No one was home at the residence. Amaya and Becerra got out of their vehicles and looked underneath the back of the truck.

Approximately an hour later, after a brief intervening trip into Hagerman to make a telephone call from a pay phone, Amaya drove the truck to Becerra's house at 400 Kansas in Hagerman, while Becerra followed in the gray car. They remained at Becerra's house for several hours. At approximately 6 p.m., Amaya drove the black truck back to 7018 LaVanne and parked in the carport, with Becerra again following in his car. After Becerra and Amaya arrived at the residence, agents observed Becerra in his gray car and another individual in a blue Ford Probe conducting "heat runs" to check for the presence of law enforcement personnel in the area. After observing the activities of the gray and blue cars, and observing Becerra's gray car begin driving away, agents stopped Becerra's car, fearing that the methamphetamine they suspected was in the black

truck had been unloaded. Becerra was driving the car when it was stopped. Agents found a loaded Taurus 9 mm. handgun on the driver's side of the car. They arrested Becerra.

Agents also detained the blue Probe parked near the residence. They found the driver, Pedro Becerra, who is defendant Becerra's nephew, in the driver's seat with a loaded 9 mm. Astra handgun on his lap. Shortly thereafter, agents discovered R.J. Becerra lying on top of a nearby RV camper. Agents secured the residence and obtained a search warrant to search the premises, including any vehicles. Amaya was arrested near the black truck, in which agents discovered 507.6 grams of methamphetamine in a hidden compartment in the truck's axle.

Following Becerra's arrest, at 7:45 p.m. on that same day (April 6), Becerra's niece, Angie Becerra, called Lopez and left a message asking him to call her "as soon as possible." Appellant's App. at 213. At 7:52 p.m., Lopez, also known as "Lupe," had the following conversation with Angie Becerra:

```
ANGIE:   Hello.
LUPE:    Ey, what's happened?
ANGIE:   No nothing.  Uhm . . .
LUPE:    Uh?
ANGIE:   . . . Nothing happened with your people yesterday?
LUPE:    Why, what happened?
ANGIE:   Because my uncle is over here being detained.
LUPE:    What uncle?
ANGIE:   Well which?  What uncle do you hang out with?  Oh my
         God . . . (crying).
LUPE:    When did they detain him?
ANGIE:   We're right here now.
LUPE:    You're there right now?
```

ANGIE:      Yes.
LUPE:       Where?
ANGIE:      They're here in town.
LUPE:       They have him detained?
ANGIE:      Yes.
                    . . .
LUPE:       Him and who else?
ANGIE:      Him and another guy.
LUPE:       What or why?
                    . . .
LUPE:       Ask them what's happened.
ANGIE:      Oh my God. No, man . . .
LUPE:       What happened?
ANGIE:      I'll call you back in a little bit.

Appellee's App. at 38-40.  Other phone calls between Angie Becerra and Lopez were also recorded.

Becerra was indicted in a three-count superceding indictment charging him with conspiracy, in violation of 21 U.S.C. § 846, possession with intent to distribute 500 grams or more of a substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).[2]  Becerra, Amaya and Huerta-Varela proceeded to trial.

During the trial, the government sought to introduce recordings and corresponding transcripts of the telephone conversations between Angie Becerra and Lopez which occurred shortly after Becerra's arrest.  Becerra objected on

---

[2]Becerra's co-defendants Amaya, Francisco Huerta-Varela, the owner of the residence at 7018 LaVanne, and Lopez were indicted on the first two counts along with Becerra.  Lopez has not been prosecuted, however, as he has remained a fugitive living in Mexico.

hearsay and confrontation clause grounds. The district court overruled the objection in part, allowing some of the recorded conversations to be admitted into evidence. At the close of the government's case, all three defendants moved for judgment of acquittal, which the court denied. The jury then found Becerra guilty of all three counts with which he was charged, found Amaya guilty of the two counts with which he was charged and acquitted Huerta-Varela. This appeal followed.

Becerra argues: (1) the district court violated his Sixth Amendment right to confront the witnesses against him when it admitted evidence of the telephone calls between Becerra's niece and Lopez following Becerra's arrest; (2) there was insufficient evidence supporting Becerra's conviction for carrying a firearm during and in relation to a drug trafficking offense; and (3) the district court erred in admitting evidence that Becerra's nephew, Pedro, was found with a weapon in his car at the time of Becerra's arrest, even though Pedro was not a co-defendant or a specific named co-conspirator.

**DISCUSSION**

**I. Telephone conversations**

As indicated, shortly after Becerra's arrest, Becerra's niece, Angie, telephoned Lopez and told him about Becerra's arrest. The government sought to introduce evidence of several of these phone calls as "co-conspirator statements"

which were "not testimonial in nature," or as evidence of a conspiracy. The

government further argued they were not hearsay, because they were not offered

to prove the truth of what was stated. Appellant's App. at 79, 194-95. Becerra

objected to their introduction, arguing that Becerra's niece was never charged as a

co-conspirator and the calls were prejudicial more than probative of anything.

The district court admitted evidence of the phone calls because they "are not

offered for their truth." Id. at 199.[3]

Relying on Crawford v. Washington, 541 U.S. 36 (2004), Becerra argues

the admission of evidence of these phone calls violated his Sixth Amendment

right to confront the witnesses against him. We "review[] de novo the legal

question of whether the admission of a . . . statement at trial violates the

accused's Sixth Amendment confrontation right." United States v. Summers, 414

F.3d 1287, 1298 (10th Cir. 2005). We review for an abuse of discretion decisions

to admit evidence which do not implicate the Sixth Amendment. United States v.

Dowlin, 408 F.3d 647, 659 (10th Cir. 2005).

In Crawford, the Supreme Court held that the Sixth Amendment's

confrontation clause requires a trial court to exclude hearsay that is "testimonial"

in nature unless the declarant is unavailable and the defendant has had an

_____

[3]The court did not allow evidence of the phone calls in on the ground that they were co-conspirator statements, because the court believed that the conspiracy had ended when Becerra and his co-defendants were arrested and the methamphetamine was seized. Additionally, only two calls were actually played for the jury. There was simply a reference to other calls.

opportunity earlier to cross-examine the declarant. Id. at 68. While the Court in Crawford did not precisely define "testimonial," it indicated "that the term encompasses formal statements to government officers, including at least statements during police interrogation and prior testimony." United States v. Faulkner, 439 F.3d 1221, 1225 (10th Cir. 2006) (citing Crawford, 541 U.S. at 51-52, 68). The Court subsequently indicated that a statement given under interrogation is testimonial if "the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 126 S. Ct. 2266, 2273-74 (2006); see also Summers, 414 F.3d at 1302 ("[A] statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime."). Further, "the [Confrontation] Clause restricts only statements meeting the traditional definition of hearsay" which is "'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" Faulkner, 439 F.3d at 1226 (quoting Fed. R. Evid. 801(c)).

The confrontation clause did not prohibit the admission of the phone calls between Angie Becerra and Lopez because those calls were not testimonial hearsay. They were not offered to prove the truth of the matters asserted in the calls, nor were they testimonial in nature under Davis or Crawford. They were

purely private informal conversations between two individuals, and they were introduced at Becerra's trial simply to demonstrate a connection between Lopez and the Becerra family. See Faulkner, 439 F.3d at 1226-27. The district court committed no error in admitting evidence of the calls.

## II. Sufficiency of evidence of carrying a firearm

Becerra was convicted of carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), based upon the fact that, when he was arrested driving his wife's gray car, there was a gun on the driver's side of the car. He argues the evidence was insufficient to support his § 924(c)(1)(A)(i) conviction.

"We review claims of insufficient evidence de novo" asking "only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Banks, 451 F.3d 721, 725 (10th Cir. 2006) (further quotation omitted). "We do not assess the credibility of witnesses or weigh conflicting evidence because these tasks are exclusively those of the jury." Id. at 725-26. We accordingly may reverse "only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 726 (further quotation omitted).

Section 924(c)(1)(A)(i) provides that "any person who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm" is subject to a mandatory five-year prison term. The "carry" part of § 924(c)(1)(A) "has two elements: (1) possession of the weapon through the exercise of dominion or control; and (2) transportation of the weapon." United States v. Lindsey, 389 F.3d 1334, 1338 (10th Cir. 2004). In Muscarello v. United States, 524 U.S. 125, 126-27 (1998), the Supreme Court held it "applies to a person who knowingly possesses and conveys firearms in a vehicle, including in the locked glove compartment or trunk of a car, which the person accompanies." Further, "we have determined that a firearm is carried during and in relation to the underlying crime when the defendant avails himself of the weapon and the weapon plays an integral role in the underlying offense." Banks, 451 F.3d at 726 (further quotation and internal alterations omitted). The "during and in relation to" requirement is satisfied when the government proves "a direct nexus between the defendant's carrying of a firearm and the underlying drug crime." Id. (further quotation omitted). This nexus requirement is established by evidence demonstrating "that the defendant intended the firearm to be available for use in the offense." Id.

The evidence in this case clearly meets the statutory definition of carrying a firearm during and in relation to a drug trafficking crime. The gun was found on the driver's (Becerra's) side of the car when he was arrested after being observed

driving in tandem with the vehicle containing the methamphetamine, and after his vehicle was observed conducting "heat runs." While he argues there was no evidence he ever used the firearm, that is irrelevant because he was convicted of carrying the firearm, not using it. We have frequently commented on the extremely common association between firearms and drug operations. United States v. Mendoza-Salgado, 964 F.2d 993, 1008 (10th Cir. 1992) ("The courts generally view items such as firearms . . . as 'tools of the trade' for distributing drugs."). Furthermore, as we discuss more fully below, evidence that Pedro Becerra was also carrying a readily accessible loaded firearm suggests that both men were using those weapons to facilitate the methamphetamine conspiracy and protect their load of contraband. A reasonable jury could easily find Becerra guilty beyond a reasonable doubt of carrying the firearm in connection with the methamphetamine conspiracy.

### III. Admission of evidence of firearm in Pedro Becerra's vehicle

As indicated above, Becerra's nephew, Pedro Becerra, was also stopped in his vehicle at the same time Becerra was arrested. A firearm was taken from Pedro Becerra's car at that time. The government sought to have the firearm seized from Pedro introduced into evidence as part of its proof of Becerra's guilt on count three—carrying a firearm during and in relation to the methamphetamine conspiracy. The government offered the firearm "to show that other participants

-11-

in the conspiracy also had firearms readily accessible" and to show that Becerra's carrying a firearm in his vehicle was "not just by accident or coincidence." Appellee's Br. at 23. The district court allowed it, "on the notion that it is relevant on the question . . . or . . . inference that Mr. Pedro Becerra or Alberto Becerra might simply have been carrying a gun because that was his practice." Appellant's App. at 206.

Becerra argues that the firearm was inadmissible because Pedro Becerra was not a co-defendant or co-conspirator. The government responds that, while Pedro Becerra was not a co-defendant of Becerra, he was clearly a co-conspirator. We review the decision to admit the firearm for an abuse of discretion. Dowlin, 408 F.3d at 659.

We agree with the government that the district court did not abuse its discretion in admitting evidence of the firearm seized from Pedro Becerra. The indictment charged that there were other conspirators, both known and unknown. There was ample evidence demonstrating Pedro Becerra's involvement in the conspiracy—conducting heat runs after the methamphetamine was delivered and meeting with Becerra shortly before the contraband was seized. Further, Pedro's possession of a firearm in his vehicle suggests that both his and Becerra's possession of a firearm was part and parcel of the conspiracy. Both men were armed to protect the contraband, a familiar scenario in drug conspiracies. United

States v. Sakyi, 160 F.3d 164, 169 (10th Cir. 1998) ("[A]s we have previously noted, guns often accompany drugs.").

## CONCLUSION

For the foregoing reasons, we AFFIRM Becerra's conviction.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge